IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| M.O., a minor, by and through <br> JEREMY OSTER, as parent and next friend, <br> <br> Plaintiff, <br> <br> v. <br> <br> HONONEGAH COMMUNITY HIGH SCHOOL DISTRICT #207, MICHAEL J. DUGAN, in his official capacity as Superintendent of Hononegah Community High School District #207, CHAD DOUGHERTY, individually and in his official capacity as Executive Associate Principal of Hononegah Community High School, and ERIC FLOHR, individually and in his official capacity as Principal of Hononegah Community High School, <br> <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## VERIFIED COMPLAINT

Plaintiff, M.O., a minor, by and through JEREMY OSTER, as parent and next friend, and by and through LAW FIRM OF DAVID G. SIGALE, P.C., her attorney, complains of the Defendants, HONONEGAH COMMUNITY HIGH SCHOOL DISTRICT #207, MICHAEL J. DUGAN, in his official capacity as Superintendent of Hononegah Community High School District #207, CHAD DOUGHERTY, individually and in his official capacity as Executive Associate Principal of Hononegah Community High School, and ERIC FLOHR, individually and in his official capacity as Principal of Hononegah Community High School, as follows:

## INTRODUCTION

1. This is a civil rights action challenging Defendants' policies and practices that act to discriminate against certain viewpoints regarding the Second Amendment generally, and against certain beliefs regarding the safety of schoolchildren from random violent attack during school hours. Specifically, while defendants supported a recent "Walk-Out" and freely permitted students at Hononegah Community High School to walk out of classes, congregate on school property, and express viewpoints promoting gun control and restrictions, they systematically segregated, suppressed, and ostracized any opposing viewpoint, including messages desired to be communicated by plaintiff M.O. to her fellow students.

2. This action is brought by minor Plaintiff M.O., seeking injunctive relief, declaratory relief, and damages, pursuant to 42 U.S.C. §§ 1983 and 1988, against the Defendants named herein.

3. This action is premised on the United States Constitution pertaining to the denial of Plaintiff's fundamental guarantees, namely, her right to free speech, due process, and to the equal protection of the law, by the Defendants named herein.

4. Defendants' actions have deprived and will continue to deprive M.O. of her paramount rights and guarantees provided under the United States Constitution, and have caused her injury.

5.  Each and every act of Defendants alleged herein was committed by Defendants, each and every one of them, under the color of state law and authority.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § § 1331 and 1343. This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §2201 and 2202.

7.  Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b), because the actions giving rise to this case occurred within the Northern District of Illinois, and Defendants reside in this District.

## PARTIES

8.  Plaintiff M.O., a minor, is a student at Hononegah High School and a resident of Rockton, Illinois.

9.  Jeremy Oster ("Mr. Oster") is M.O.'s father and likewise resides in Rockton, Illinois. He lives in the same household as M.O..

10. Defendant Hononegah Community School District #207 ("the District") is a public entity established, organized, and authorized under and pursuant to the laws of Illinois with the authority to sue and be sued in its own name.  It is governed by the Hononegah Community School District #207 School Board ("Board"), which acts as the governing body for Hononegah Community School District #207, and sets policy for the school system.

11. Defendant Michael J. Dugan ("Superintendent Dugan") is the Superintendent of Hononegah Community School District #207. At all times

pertinent, his predecessor Lynn M. Gibson held that position. In his official capacity, Superintendent Dugan is responsible for carrying out policies of the Board. This Defendant is sued in his official capacity.

12. Defendant Chad Dougherty is and was at all times pertinent the Executive Associate Principal of Hononegah Community High School ("HCHS"). In his official capacity, among other duties, he is the second-highest official who oversees and implements District policies as they apply to HCHS, as well as the second-highest official who makes policy for HCHS. This Defendant is sued in his individual and official capacities.

13. Defendant Eric Flohr is and was at all times pertinent the Principal of HCHS. In his official capacity, among other duties, he is the highest official who oversees and implements District policies as they apply to HCHS, as well as the highest official who makes policy for HCHS. This Defendant is sued in his individual and official capacities.

## STATEMENT OF FACTS

14. M.O. is a sixteen-year old student currently enrolled at HCHS in Hononegah Community School District #207. She is a junior in classification.

15. M.O. has sincerely-held beliefs regarding the individual right of the Second Amendment, firearms policies in general, and about the optimal way to protect schools in the event of a violent attack.

16. M.O. believes that the best way to protect schoolchildren while on school premises is to "harden" the schools, with measures such as metal detectors,

armed security guards and other staff, and other measures that do not involve banning firearms or disarming law-abiding persons.

17. In partial response to the tragic shooting at Marjory Stoneman Douglas High School in Parkland, Florida in February, 2018, the students of HCHS organized a "walkout" to take place on March 14, 2018, whereby they would leave class, congregate on the HCHS football field, and promote an anti-gun violence agenda that involved the banning of certain firearms, and the prohibition of certain law-abiding persons from possessing firearms, as the way to achieve school safety.

18. The walkout, originally conceived by survivors of the Parkland school shooting, as well as politicians and organizations who also support a gun control agenda, was publicized and promoted with the purpose of one taking place in every school across the United States on that date at 10:00A.M.

19. On a broader national scale, the organizers and promoters of the walkout were also promoting federal gun control legislation, as well as the election of political candidates that supported gun control legislation.

20. M.O. strongly disagreed with these political views, as well as the best way to prevent gun violence in schools, but understood that students have a right to share their viewpoints on this and other issues.

21. Prior to March 14, 2018, Jeremy notified the then-District Superintendent, Lynn M. Gibson, that M.O. planned to carry signs expressing her pro-gun views during the walkout. Specifically, her signs read "Pro Life, Pro God, Pro Gun" and "Protect Us, Police For All Schools." The school attendance office

verified with staff that the signs would be permitted, and allowed Jeremy and M.O. to store them there in the attendance office that morning before the walkout. Neither M.O. nor Jeremy were given any reason to suspect that M.O. might not be allowed to participate in the walkout on an equal basis with other students.

22. The administration and faculty at HCHS helped facilitate the walkout by providing an area on school grounds for the students to congregate, and by not punishing or reprimanding the students for leaving class in the middle of that school period.

23. On March 14, 2018, at 10:00A.M., approximately fifty to seventy-five students exited the HCHS building under the direction of school personnel. However, M.O. and approximately five other pro-gun rights students were made to wait until all of their classmates holding the opposing viewpoint had exited. Those other students gathered approximately halfway down the football field, facing the north bleachers. Some of them, dressed in red, staged a "die-in" by lying on the ground.

24. Assistant Executive Principal Dougherty would not allow the pro-gun rights students onto the football field, requiring them instead to stand with their signs on the sidewalk near the front door to HCHS, outside the football field and separated from it by part of the parking lot. When M.O. asked Mr. Dougherty why her group was not allowed on the field with everyone else, he suggested that they would disturb the peace and start a fight. When M.O. persisted, Dougherty

6

eventually relented, ushering them across the parking lot, to the football field, and through the gate with a sarcastic bow.

25. Still, the small group was required to remain separated from all other participants just inside the fence, out of everyone else's sight or hearing. M.O. continued to ask Dougherty why her group could not join the others. This was especially important to M.O. since she believed some of the other students would agree with her views. Dougherty called M.O. and the pro-gun-rights group "troublemakers," and called for Principal Flohr. Eventually, Flohr approached and told the students, "You are the only ones who feel that way," in obvious reference to their pro-gun-rights views. Flohr then turned his back on them and refused any further discussion.

26. Based on Dougherty and Flohr's conduct, M.O. reasonably believed that had she gone to join the other students across the football field, that she would have been detained and punished for attempting to express her opposing viewpoint.

27. At the end of the walkout, Dougherty subjected M.O.'s group to the taunts of their classmates by holding them aside while all of the other students walked past them into the building. One student yelled at M.O. to kill herself. Another student took pictures of M.O.'s group, one of which reportedly became an online meme and method of ridicule among the other HCHS students.

28. Finally and ironically, before allowing them to return to class, Dougherty warned the small pro-gun-rights group not to bully the students with different views.

29. There was no apparent reason to believe that substantial disruption would occur if pro-gun-rights students were given an equal opportunity for expression during the walkout. M.O.'s and the students' stated intention was to stand quietly with their signs and present a different view on the subject of gun regulation and school safety. There was no reason to believe that they would deviate from that intention, and M.O. and the students did nothing that would reasonably have caused such a concern.

30. The distance between the two groups, approximately 95 yards away, effectively removed the pro-gun-rights students from the demonstration altogether, keeping them out of everyone else's sight and hearing, and prevented them from communicating their views to anyone but each other.

31. Moreover, by twice requiring the pro-gun-rights group to stand by while the other demonstrators walked past, Dougherty and Flohr signaled that said small group of students was disfavored and their views unworthy of respect. This impression was reinforced when Dougherty and Flohr showed no reaction to students' taunting of M.O. and those who shared her opinions except for muted chuckling.

32. M.O. explained what happened and expressed her disappointment over the walkout, and her over the bullying to a school officer, and then to Jeremy, her father. Jeremy decided M.O. should come home early. M.O. left HCHS early that day, feeling bullied and ostracized, and firmly convinced that HCHS does not value her or other students who share her beliefs.

8

33. Ultimately, M.O. stayed home from school for one week as a result of the bullying she suffered as a result of the walkout and the Defendants' indifference thereto.

34. Jeremy filed a grievance with HCHS, but Superintendent Gibson sided with the Defendants.

35. Hononegah Community High School District publishes a policy manual that includes a section entitled "Student Rights and Responsibilities" (HCHS Policy). In § 7:130, this Policy states in relevant part:

> All students are entitled to enjoy the rights protected by the U.S. and Illinois Constitutions and laws for persons of their age and maturity in a school setting.

36. HCHS Policy § 7:315 further states, in relevant part:

> <u>Non-School Sponsored Publications Accessed or Distributed On Campus</u>
>
> For purposes of this section and the following section, a publication includes, without limitation: (1) written or electronic print material, (2) audio-visual material . . .
> Creating, distributing, and/or accessing non-school sponsored publications shall occur at a time and place and in a manner that will not cause disruption, be coercive, or result in the perception that the distribution or the publication is endorsed by the School District.
>
> Students are prohibited from creating, distributing, and/or accessing at school any publication that:
>
> 1. Will cause a material and substantial disruption of the proper and orderly operation and discipline of the school or school activities;
>
>    . . .

9

      3.     Is socially inappropriate or inappropriate due to maturity level of the students, including but not limited to material that is obscene, pornographic, or pervasively lewd and vulgar, contains indecent and vulgar language, or sexting as defined by School Board policy and Student Handbooks;

. . .

37.     These policies, on their face, serve to foster students like M.O. who wanted to exercise their constitutional rights and express a contrary viewpoint without suffering an intimidating and hostile educational environment. However, at and following the walkout of March 14, 2018, through the interpretation or lack of application of this policy, the Defendants unreasonably segregated M.O., kept her out of sight and hearing from the other students at the walkout, and prohibited her from expressing a viewpoint contrary to the mainstream.

38.     Further, while HCHS acknowledges that "[b]ullying, intimidation, and harassment diminish a student's ability to learn and a school's ability to educate." and that "[p]reventing students from engaging in these disruptive behaviors and providing all students equal access to a safe, non-hostile learning environment are important District goals" (HCHS Policy § 7:180), that did not happen in M.O.'s case. Ironically, Flohr is listed as a bullying "Complaint Manager" to whom such events should be reported.

39.     The HCHS Handbook also contains a section entitled "Student Behavior" (HCHS Policy 7:190) This section states, in relevant part as follows:

    <u>Prohibited Student Conduct</u>

> The school administration is authorized to discipline students for gross disobedience or misconduct, including but not limited to:
>
> . . .
>
> 9. Engaging in hazing or any kind of bullying or aggressive behavior that does physical or psychological harm to a staff person or another student, or urging other students to engage in such conduct. Prohibited conduct specifically includes, without limitation, any use of violence, intimidation, force, noise, coercion, threats, stalking, harassment, sexual harassment, public humiliation, theft or destruction of property, retaliation, hazing, bullying, bullying using a school computer or a school computer network, or other comparable conduct.

40. This is also echoed, and applied to teachers, administrators, and other school personnel as well, in HCHS Policy § 7:20, which states, in relevant part:

> The School District will not tolerate harassing, intimidating conduct, or bullying whether verbal, physical, electronic, or visual, that affects the tangible benefits of education, that unreasonably interferes with a student's educational performance, or that creates an intimidating, hostile, or offensive educational environment. Examples of prohibited conduct include name-calling, using derogatory slurs, causing psychological harm, threatening or causing physical harm . . .

41. These policies, on their face, serve to protect students like M.O. who wanted to express a contrary viewpoint without suffering an intimidating and hostile educational environment. However, at and following the walkout of March 14, 2018, through the interpretation or lack of application of these policies, the Defendants ostracized M.O., and allowed her to be bullied, for expressing a viewpoint contrary to the mainstream.

42. Neither M.O.'s sign, nor any of her behavior while attending school on March 14, 2018, in any way created a danger of imminent commission of unlawful

11

acts on school premises or constituted the violation of lawful school regulations, or threatened substantial disruption of the orderly operation of the school, nor was there any reasonable basis to believe this would be the case.

43. M.O. suffered unlawful discrimination, humiliation, and punishment at the hands of HCHS personnel, and specifically Dougherty and Flohr, simply because of disapproval of the viewpoint M.O. wished to express.

44. Defendants continue to interpret their policies to quash the pro-gun-rights speech desired by M.O. and any other similarly-situated student regarding gun rights and school safety.

45. M.O. wants to display her sign and express her viewpoints at HCHS for her remaining student years, whether during future walkouts or other student gatherings or demonstrations. She wants to express her disagreement with the gun control agenda, and their viewpoints about school safety.

46. Defendants' policies, and their enforcement of same, serve to quell M.O.'s anticipated messages. Under their policies and practices, M.O. would be segregated and ostracized for expressing these messages.

47. The acts of Defendants are chilling and deterring M.O.'s exercise of political speech, and M.O. has no adequate remedy at law to redress the violations of their rights.

48. Unless and until the enforcement of Defendants' current practices identified herein are enjoined, and the HCHS policies meant to protect M.O. are enforced, M.O. will suffer, and continues to suffer, irreparable harm.

## COUNT I – FREEDOM OF SPEECH
## U.S. CONST. AMEND I ; 42 U.S.C. § 1983

49. Plaintiff repeats and realleges Paragraph 1 through 48, inclusive, as if fully incorporated herein.

50. M.O.'s speech regarding school safety and firearms policy is protected speech under the First Amendment.

51. District's and Dugan's HCHS Policy § 7:315, and Dougherty's and Flohr's actions and implementation of said Policy, that served to promote one view of the school safety and gun-rights debate and ban the opposing view:

  a. singled out pro-gun-rights speech for discriminatory treatment;

  b. discriminated against speech because of its content;

  c. acted as an unlawful prior restraint on M.O.'s speech due solely to disapproval of the content of said speech;

  d. discriminated against speech on the basis of the speaker's viewpoint;

  e. restrained constitutionally protected speech with virtually no guidelines or standards to guide the discretion of school officials charged with enforcing HCHS Policy § 7:315;

  f. chilled the free speech of M.O. and other similarly-minded students;

      g.    improperly prohibited speech merely because it may allegedly be "offensive."

52. Defendants have no compelling or legitimate reason that would justify their censorship of the viewpoints sought to be expressed by M.O., especially in light of HCHS Policy § 7:130.

53. Defendants were acting under color of law when they unreasonably deprived M.O. of her clearly-established constitutional rights as described herein.

54. District's and Dugan's HCHS Policy § 7:315, and Dougherty's and Flohr's actions and implementation of said Policy, thus violated the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court grant the equitable and legal relief set forth in the Prayer for Relief.

### COUNT II – EQUAL PROTECTION CLAUSE
### U.S. CONST. AMEND. XIV ; 42 U.S.C. § 1983

55. Plaintiff repeats and realleges Paragraph 1 through 54, inclusive, as if fully restated herein.

56. Under District's and Dugan's HCHS Policy § 7:315, and Dougherty and Flohr's actions and implementation of said Policy, during the March 14, 2018 walkout Defendants allowed other students to express one view of school safety which involves gun control and gun bans, while preventing the expression of an alternative/opposite view. During the walkout, Dougherty and Flohr intentionally

segregated M.O. so as to prevent her expression of a viewpoint of a school-sanctioned view of school safety and gun control.

57. Under HCHS Policy § 7:315, and Dougherty and Flohr's implementation of said policy, Defendants have allowed certain other students and school officials to express their allegedly "positive" viewpoints on the issue of school safety and gun rights but have censored M.O. and other like-minded students from expressing their allegedly "negative" opposing viewpoints on these issues.

58. Defendants' policies and actions intentionally treated M.O. differently than other similarly-situated students based solely on her expression of her viewpoint.

59. Defendants have no compelling or legitimate reason that would justify their disparate treatment of M.O., especially in light of HCHS Policy § 7:130.

60. Defendants were acting under color of law when they unreasonably deprived M.O. of her clearly-established constitutional rights as described herein.

61. District's and Dugan's HCHS Policy § 7:315, and Dougherty's and Flohr's enforcement thereof, therefore violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff M.O., by and through JEREMY OSTER, as parent and next friend, respectfully prays this Honorable Court grant the equitable and legal relief set forth in the Prayer for Relief.

## COUNT III – DUE PROCESS CLAUSE
## U.S. CONST. AMEND. XIV ; 42 U.S.C. § 1983

62. Plaintiff repeats and realleges Paragraph 1 through 61, inclusive, as if fully incorporated herein.

63. District's and Dugan's policies regarding students' speech at HCHS, specifically HCHS Policy § 7:315, are vague and lack sufficient objective standards to curtail the discretion of school officials, and thus allowed Defendants Dougherty and Flohr to enforce the policies in an *ad hoc* and discriminatory manner.

64. Defendants have no compelling or legitimate reason that would justify their vague policy, especially in light of HCHS Policy § 7:130.

65. Defendants were acting under color of law when they unreasonably deprived M.O. of her clearly-established constitutional rights as described herein.

66. District's and Dugan's policies, and Defendants Dougherty's and Flohr's enforcement thereof, therefore violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff M.O., by and through JEREMY OSTER, as parent and next friend, respectfully prays this Honorable Court grant the equitable and legal relief set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, M.O., by and through JEREMY OSTER, as parent and next friend, requests this Honorable Court enter judgment in her favor and against the Defendants, HONONEGAH COMMUNITY HIGH SCHOOL DISTRICT #207, MICHAEL J. DUGAN, in his official capacity as Superintendent of

Hononegah Community High School District #207, CHAD DOUGHERTY, individually and in his official capacity as Executive Associate Principal of Hononegah Community High School, and ERIC FLOHR, individually and in his official capacity as Principal of Hononegah Community High School, and to grant Plaintiff the following relief as to all Counts above:

A.  That this Court issue Preliminary and Permanent Injunctions enjoining Defendants, their agents, employees, and all persons in active concert or participation with them from violating Plaintiff's constitutional rights by selectively banning her viewpoint about gun rights and school safety at HCHS;

B.  That this Court render a Declaratory Judgment declaring that Defendants' HCHS Policy § 7:315, and their actions and practice of selectively banning certain expression about gun rights and school safety, violates the First and Fourteenth Amendments to the United States Constitution;

C.  Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy in order that such declaration shall have the force and effect of final judgment;

D.  Retain jurisdiction of this matter for the purpose of enforcing this Court's order;

E.  Grant an award of monetary damages to Plaintiff against Defendants in an amount this Court deems appropriate for their policies and

      actions which allowed and placed M.O. in a position to be bullied by other students, despite clear HCHS policies prohibiting such conduct by both students and staff;

F.    Grant Plaintiff reasonable costs and expenses of this action, including attorney's fees in accordance with 42 U.S.C. § 1988; and

G.    Grant such other and further relief as this Court deems just and proper.

Dated:   July 30, 2018                    /s/ David G. Sigale
                                            David G. Sigale

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
Tel: 630.452.4547
Fax: 630.596.4445
dsigale@sigalelaw.com

*Attorneys for Plaintiffs*

## F.R.CIV.P. 11 CERTIFICATION OF COMPLAINT

M.O., a minor, and Jeremy Oster, citizens of the United States and residents of Rockton, Illinois, by their signatures below, swear that they have read the foregoing Complaint and have understood it to the best of their ability. They state that they are not lawyers. They agree, under penalty of law pursuant to F.R.Civ.P. 11, that based on their understanding of the Complaint, the contents are truthful, accurate and are based on their best recollection of the events described.

Date: July 30, 2018

    /s/ M.O.                                      /s/ Jeremy Oster
    M.O.                                           Jeremy Oster

Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
Tel: 630.452.4547
Fax: 630.596.4445
dsigale@sigalelaw.com

*Attorneys for Plaintiffs*