IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| M.O., a minor, by and through ) | |
| Jeremy Oster, as parent and next friend, ) | |
| ) | |
| Plaintiff, ) | Case No. 18 C 50260 |
| ) | |
| vs. ) | |
| ) | |
| Hononegah Community High ) | |
| School District #207, et al., ) | Judge Philip G. Reinhard |
| ) | |
| Defendant. ) | |

## ORDER

For the reasons stated below, defendants' motion to dismiss [14] is granted in part and denied in part. The motion is granted as to the claims against the District and against Dugan, Flohr, and Dougherty in their official capacities and denied as to the individual capacity claims against Flohr and Dougherty. There is a presumption in favor of giving plaintiff at least one opportunity to amend a complaint that is dismissed. Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago, 786 F.3d 510, 518 (7th Cir. 2015), and the court will afford plaintiff such an opportunity if plaintiff wishes to file one and can do so consistent with Fed. R. Civ. P. 11. The claims against the District are dismissed without prejudice. The official capacity claims are redundant and should not be included in any amended complaint. The parties are directed to contact the magistrate judge on or before June 7, 2019 to discuss settlement possibilities. If no settlement is reached, the magistrate judge will set a deadline for filing any amended complaint against the District.

## STATEMENT-OPINION

Plaintiff, M.O., a minor, by her parent and next friend, Jeremy Oster, brings this action against defendants Hononegah Community High School District # 207 ("District"), Michael J. Dugan, in his official capacity as superintendent of the District, Chad Dougherty, individually and in his official capacity as Executive Associate Principal of Hononegah Community High School ("HCHS"), and Eric Flohr, individually and in his official capacity as Principal of HCHS. Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 for violation of her freedom of speech under the First Amendment to the United States Constitution (Count I), denial of equal protection (Count II) and due process (Count III) in violation the Fourteenth Amendment to the United States Constitution. Subject matter jurisdiction is proper. 28 U.S.C. § 1331. Defendants move

to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

In ruling on a motion to dismiss for failure to state a claim, all well-pleaded facts are taken as true and all reasonable inferences are drawn in the plaintiff's favor. Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2019). "To avoid dismissal, the complaint must state a claim to relief that is plausible on its face." Id. (quotation marks and citation omitted).

The facts are taken from the allegations in plaintiff's complaint [1]. Plaintiff is a student enrolled at HCHS. Plaintiff has sincerely held beliefs regarding the individual right of the Second Amendment, firearms policies in general, and about the optimal way to protect schools in the event of a violent attack. She believes the best way to protect schoolchildren is to harden the schools with measures such as metal detectors, armed security guards and other staff, and other measures that do not involve banning firearms or disarming law-abiding persons. In response to the shooting at Marjory Stoneman Douglas High School in Parkland, Florida in February, 2018, students at HCHS organized a "walkout" to take place on March 14, 2018. During the walkout, students would leave class, congregate on the HCHS football field, and promote an anti-gun violence agenda that involved banning certain firearms, and prohibiting certain law-abiding persons from possessing firearms, as the way to achieve school safety.

The walkout, originally conceived by survivors of the Parkland school shooting, as well as politicians and organizations who also support a gun control agenda, was publicized and promoted with the purpose of one taking place in every school across the United States on that date at 10:00 a.m. On a broader scale, the organizers and promoters of the walkout were also promoting federal gun control legislation, as well as the election of political candidates that supported gun control legislation.

Plaintiff strongly disagreed with these political views, as well as the best way to prevent gun violence in schools, but understood that students have a right to share their viewpoints on this and other issues. Prior to March 14, 2018, plaintiff's father notified the District's then superintendent, Lynn M. Gibson, that plaintiff planned to carry signs during the walkout expressing her pro-gun viewpoints. Specifically her signs read "Pro Life, Pro God, Pro Gun" and "Protect Us, Police For All Schools." The school attendance office verified with staff that the signs would be permitted, and allowed plaintiff to store them in the attendance office the morning before the walkout. Plaintiff was never given any reason to suspect she might not be allowed to participate in the walkout on an equal basis with other students.

The administration and faculty of HCHS helped facilitate the walkout by providing an area on school grounds for the students to congregate and by not punishing the students for leaving class in the middle of that class period. On March 14, 2018, at 10:00 a.m. approximately fifty to seventy-five students exited the HCHS building under the direction of school personnel. M.O. and approximately five other pro-gun rights students were made to wait until all of their

classmates holding the opposing viewpoint had exited. Those other students gathered on the football field. Some of them, dressed in red, staged a "die-in" by lying on the ground.

Dougherty would not allow the pro-gun rights students onto the football field, requiring them instead to stand with their signs on the sidewalk near the front door to HCHS, outside the football field and separated from it by part of the parking lot. When M.O. asked Dougherty why her group was not allowed on the field with everyone else, he suggested that they would disturb the peace and start a fight. When M.O. persisted, Dougherty eventually relented, ushering them across the parking lot, to the football field, and through the gate with a sarcastic bow. M.O.'s group was required to remain separated from all other participants. The were required to stand just inside the fence, out of everyone else's sight or hearing. M.O. continued to ask Dougherty why her group could not join the others. This was especially important to M.O. since she believed some of the other students would agree with her views. Dougherty called M.O. and the pro-gun-rights group "troublemakers" and called for Principal Flohr. Eventually, Flohr approached and told the students, "You are the only ones who feel that way" in obvious reference to their pro-gun-rights views. Flohr then turned his back on them and refused any further discussion.

Based on Dougherty and Flohr's conduct, M.O. believed that had she gone to join the other students across the football filed, that she would have been detained and punished for attempting to express her opposing viewpoint. At the end of the walkout, Dougherty subjected M.O.'s group to the taunts of their classmates by holding them aside while all of the other students walked past them into the building. Before allowing them to return to class, Dougherty warned the pro-gun-rights group not to bully the students with different views.

M.O. alleges there was no apparent reason to believe that substantial disruption would occur if pro-gun-rights students were given an equal opportunity for expression during the walkout. M.O.'s group's stated intention was to stand quietly with their signs and present a different view on the subject of gun regulation and school safety. M.O.'s group did nothing that would cause a concern they would deviate from that plan.

The distance between the two groups, approximately 95 yards, effectively removed the pro-gun-rights students from the demonstration, keeping them out of everyone else's sight and hearing, and prevented them from communicating their views to anyone but each other.

M.O. alleges that by twice requiring the pro-gun-rights group to stand by while the other demonstrators walked past, Dougherty and Flohr signaled that M.O.'s group was disfavored and their views unworthy of respect. This impression was reinforced when Dougherty and Flohr showed no reaction, except for muted laughter, to students taunting M.O. and those who shared her opinions.

After expressing her disappointment over these events to a school officer and to her father, M.O. left school early that day feeling bullied and ostracized, and firmly convinced HCHS

does not value her or other students who share her beliefs. M.O. stayed home from school for one week as a result of the bullying she suffered as a result of the walkout and defendants' indifference thereto. M.O.'s father filed a grievance with HCHS but the then District superintendent, Lynn Gibson, sided with defendants.

The District publishes a policy manual ("Manual"). Section 7:130 of the Manual states in relevant part: "All students are entitled to enjoy the rights protected by the U.S. and Illinois Constitutions and laws for persons of their age and maturity in a school setting." Section 7:315 of the Manual provides in relevant part:

> "Non-School Sponsored Publications Accessed or Distributed On Campus
>
> For purposes of this section and the following section, a publication includes, without limitation: (1) written or electronic print material, (2) audio-visual material . . .
> Creating, distributing, and/or accessing non-school sponsored publications shall occur at a time and place and in a manner that will not cause disruption, be coercive, or result in the perception that the distribution or publication is endorsed by the School District.
>
> Students are prohibited from creating, distributing, and/or accessing at school any publication that:
>
> 1.   Will cause a material and substantial disruption of the proper and orderly operation and discipline of the school or school activities;
>
> . . .
>
> 3.   Is socially inappropriate or inappropriate due to maturity level of the students, including but not limited to material that is obscene, pornographic, or pervasively lewd and vulgar, contains indecent and vulgar language, or sexting as defined by School Board policy and Student Handbooks."

Plaintiff alleges these polices on their face "serve to foster students like M.O. who wanted to exercise their constitutional rights and express a contrary viewpoint without suffering an intimidating and hostile educational environment. However, at and following the walkout of March 14, 2018, through the interpretation or lack of application of this policy, the Defendants unreasonably segregated M.O., kept her out of sight and hearing from the other students at the walkout, and prohibited her from expressing a viewpoint contrary to the mainstream."

Plaintiff alleges HCHS acknowledges that "bullying, intimidation and harassment diminish a student's ability to learn and a school's ability to educate" and that "preventing

students from engaging in these disruptive behaviors and providing all students equal access to a safe, non-hostile learning environment are important District goals," but that did not happen in M.O.'s case.

Plaintiff alleges the Manual contains a section entitled "Student Behavior" which states in relevant part:

"Prohibited Student Conduct

The school administration is authorized to discipline students for gross disobedience or misconduct, including but not limited to:

. . .

9. Engaging in hazing or any kind of bullying or aggressive behavior that does physical or psychological harm to a staff person or another student, or urging other students to engage in such conduct. Prohibited conduct specifically includes, without limitation, any use of violence, intimidation, force, noise, coercion, threats, stalking, harassment, sexual harassment, public humiliation, theft or destruction of property, retaliation, hazing, bullying, bullying using a school computer or a school computer network, or other comparable conduct."

The Manual has a similar provision applied to teachers, administrators, and other school personnel which states in relevant part:

"The School District will not tolerate harassing, intimidating conduct, or bullying whether verbal, physical, electronic, or visual, that affects the tangible benefits of education, that unreasonably interferes with a student's educational performance, or that creates an intimidating, hostile, or offensive educational environment. Examples of prohibited conduct include name-calling, using derogatory slurs, causing psychological harm, threatening or causing physical harm . . ."

Plaintiff alleges these policies serve to protect plaintiff, who wanted to express a contrary viewpoint without suffering an intimidating and hostile educational environment but that following the March 14, 2018 walkout, through the interpretation or lack of application of these policies, the defendants ostracized plaintiff and allowed her to be bullied for expressing a viewpoint contrary to the mainstream.

Neither plaintiff's sign, nor her behavior at school on March 14, 2018, created a danger of imminent commission of unlawful acts on school premises or constituted violation of lawful school regulations, or threatened substantial disruption of the orderly operation of the school, nor was there any reasonable basis to believe otherwise. Defendants continue to interpret their

5

policies to quash pro-gun-rights speech desired by plaintiff and other similarly-situated students regarding gun rights and school safety.

Plaintiff sues the District, Dugan, in his official capacity as the District's superintendent, and Dougherty and Flohr both in their official capacities and individually.

> "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." It is not a suit against the official personally, for the real party in interest is the entity."

Kentucky v. Graham, 473 U.S. 159, 165-66 (emphasis in original) (citations and quotation marks omitted).

> "On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation; thus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law. When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law. In an official-capacity action, these defenses are unavailable."
> Id., at 166-67 (emphasis in original) (citations and quotation marks omitted).

Since Dugan is sued only in his official capacity, the action against him is actually an action against the District, the entity for which he is an agent. Because the District is also a defendant, the action against Dugan in his official capacity is redundant. Likewise, the official-capacity actions against Dougherty and Flohr are redundant. The District is the real party in interest as to the official capacity claims. The official-capacity claims against Dugan, Flohr and Dougherty are dismissed. Jaythan E. v. Bd of Educ. of Sykuta Elementary School, 219 F. Supp.3d 840, 844 (N.D. Ill. 2016).

The District can be found liable under Section 1983 for violating a plaintiff's civil rights only through (1) an express policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority. Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 629 (7th Cir. 2009). Plaintiff concedes for purposes of this motion that she is not arguing a widespread practice constituting custom or

usage. Dkt # 24, p. 10.[1]  She argues that the policy in the Manual's section 7:135 (quoted above) is an express policy violating her First and Fourteenth Amendment rights because it "(1) quashes speech that has a viewpoint that differs from the mainstream on the specious basis that it can be considered materially or substantively disruptive, or (2) chills speech that the would-be speaker fears would be considered disruptive and thus subjects the student to punishment."  She also argues that this policy is impermissibly vague and that her injuries were caused by people with final policymaking authority.

Plaintiff relies on Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969) and Grayned v, City of Rockford, 408 U.S. 104 (1972) to support her argument. In Tinker, the Supreme Court held that "[t]he prohibition of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible" Tinker, 393 U.S. at 511.

In Grayned, a city ordinance prohibited a person while on grounds adjacent to a school, which was in session, from the willful "making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof."  Grayned, 408 U.S. at 107-08.  The Supreme Court upheld this ordinance.  In doing so, it looked to Tinker noting that "expressive activity may be prohibited if it 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'"  Id., at 118 (quoting Tinker, 393 U.S. at 513). Grayned stated further:

> "Far from having an impermissibly broad prophylactic ordinance, Rockford punishes only conduct which disrupts or is about to disrupt normal school activities.  That decision is made, as it should be, on an individualized basis, given the particular fact situation.  Peaceful picketing which does not interfere with the ordinary functioning of the school is permitted.  And the ordinance gives no license to punish anyone because of what he is saying.
>
> We recognize that the ordinance prohibits some picketing that is neither violent nor physically obstructive.  Noisy demonstrations that disrupt or are incompatible with normal school activities are obviously within the ordinance's reach.  Such expressive conduct may be constitutionally protected at other places or other times but next to a school while classes are in session, it may be prohibited.  The antinoise ordinance imposes no such restriction on expressive activity before or after school sessions, while the student/faculty 'audience' enters and leaves the school."
>
> Id., at 119-20 (citations omitted).

---

[1] Plaintiff leaves open the possibility that discovery may produce evidence that could give rise to such a claim.

7

Plaintiff argues the District's express policy runs afoul of Tinker and Grayned because it allows suppression of speech based on its content rather than establishing a viewpoint-neutral time, place, or manner restriction. She further argues, relying on Grayned, that the District's policy is vague and, therefore, violates the Fourteenth Amendment's Due Process Clause because it does not provide reasonable notice "of what is disruptive, coercive, or causing a material and substantial disruption of the proper and orderly operation and discipline of the school or is 'socially inappropriate' or vulgar or indecent." Plaintiff quotes the following passage from Grayned:

> "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.' Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'"

Id., at 108-09 (alterations in original) (footnotes omitted).

The policy, as presented by plaintiff in her complaint, prohibits students from "creating, distributing, and/or accessing at school any publication that [ ] [w]ill cause a material or substantial disruption of the proper and orderly operation and discipline of the school or school activities." This language tracks fairly closely the language of Tinker ("material and substantial interference with schoolwork or discipline"; "materially disrupts classwork or involves substantial disorder") noted above. The policy itself, therefore, did not work a deprivation of plaintiff's constitutional rights. The policy is aligned with the constitutional requirements established in Tinker. It is neither unconstitutionally vague nor an unconstitutional suppression of speech. It prohibits "only conduct which disrupts or is about to disrupt normal school activities. That decision is made, as it should be, on an individualized basis, given the particular fact situation." Grayned, 408 U.S. at 119.[2]

---

[2] Plaintiff's assertion that the policy is vague because it does not provide reasonable notice of what is "socially inappropriate" or "vulgar or indecent" is off the mark. The policy language on this subject is as follows: "socially inappropriate or inappropriate due to maturity level of the students, including but not limited to material that is obscene, pornographic, or pervasively lewd and vulgar, contains indecent and vulgar language, or sexting as defined by School Board policy and Student Handbooks." This language addresses matters of a sexual nature which

Plaintiff also contends she was injured by people with final policymaking authority. Whether an official has "final policymaking authority is a question of state law." Pembauer v. City of Cincinnati, 475 U.S. 469, 483 (1986). Plaintiff argues Flohr and Dougherty have final policymaking authority because an Illinois statute states that the principal, with the assistance of assistant principals, "shall assume administrative responsibilities and instructional leadership, under supervision of the superintendent, and in accordance with reasonable rules and regulations of the board, for planning, operation and evaluation of the educational programs." 105 ILCS 5/10-21.4a.

Under Illinois law, only the school board has final policymaking authority. Jaythan, 219 F. Supp.3d at 846 (collecting cases). "Although the Illinois School Code does not grant principals final policymaking authority, final policymaking authority may be delegated or ratified by an official having policymaking authority." Id. However, plaintiff does not allege the District's board delegated policymaking authority to Flohr and Dougherty. Her complaint alleges Flohr and Dougherty were, respectively, the highest and second-highest officials who oversee and implement District policies as they apply to HCHS as well as the highest and second-highest officials "who make[ ] policy for HCHS." In her brief, she argues Flohr's and Dougherty's policymaking authority came directly from 105 ILCS 5/10-21a. This is the same provision the plaintiffs in Jaythan alleged granted a principal policymaking authority. Id. But, nothing in the Illinois School Code (including 105 ILCS 5/10-21a) grants principals or assistant principals policymaking authority, id., and plaintiff's complaint alleges Flohr and Dougherty oversee and implement District policies, not that the District's board delegated policymaking authority to them. "Under the delegation theory, the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions." Darchak, 580 F.3d at 630. Plaintiff's complaint does not allege a delegation by the school board of policymaking authority to Flohr and Dougherty. It alleges they had the power to make decisions under the District's policies and misused that power to deprive plaintiff of her constitutional rights. These allegations do not state a Section 1983 claim against the District based on the actions of Flohr and Dougherty.

Plaintiff also argues the District is liable based on the actions of prior district superintendent Gibson. Plaintiff states in her brief that she "acknowledges Dugan became District Superintendent after the events described in the Complaint, but M.O. also alleges his predecessor Lynn Gibson, did have involvement in the events described therein." Dkt # 24, p.13. Plaintiff's complaint alleges that prior to March 14, 2018, M.O.'s father notified Gibson that M.O. planned to carry signs expressing her pro-gun views during the walkout and that neither he nor M.O. "were given any reason to suspect that M.O. might not be allowed to participate in the walkout on an equal basis with other students." It also alleges plaintiff's father "filed a grievance with HCHS, but Superintendent Gibson sided with the defendants." Neither of these allegations allege a delegation of policymaking authority by the District's board to Gibson. Plaintiff's brief also states "[a]s the then-District Superintendent, she [Gibson] did have final policymaking

---

are not at issue in this case.

authority as to the Policy Manual sections alleged in M.O.'s Complaint." Dkt # 24, p.13. However, plaintiff does not point to any delegation by the District's board to the superintendent of final policymaking authority over the contents of the Manual and, as discussed above, the policy in the Manual challenged by plaintiff did not work a deprivation of plaintiff's constitutional rights. Accordingly, the allegations concerning Gibson do not state a Section 1983 claim against the District.[3]

Plaintiff also sues Flohr and Dougherty in their individual capacities. She alleges that, while acting under color of state law, they deprived her of her constitutional rights. Defendants argue the complaint does not allege any action by Flohr that support a claim he deprived plaintiff of any constitutional right. They also argue both Flohr and Dougherty are entitled to qualified immunity for their actions thus requiring dismissal of the claims against them.

The complaint alleges that in response to plaintiff continuing to ask Dougherty why he required her, and her fellow pro-gun-rights students, to stay separated from the other walkout participants – out of their sight and hearing – Dougherty called for Flohr. When Flohr arrived, he told plaintiff's group that "you are the only ones who feel that way" in obvious reference to their pro-gun-rights views, turned his back on them, and refused any further discussion. Plaintiff and her group were never allowed to join the rest of the walkout participants.

Drawing all reasonable inferences in plaintiff's favor, Kanter, 919 F.3d at 441, plaintiff has alleged action by Flohr depriving her of a constitutional right. According to the complaint, Flohr was called to the scene by Dougherty in response to plaintiff's persistence in asking why she and her small pro-gun-rights group were being barred from joining the rest of the walkout participants. Upon his arrival, Flohr made the statement "you are the only ones who feel that way." It can reasonably be inferred from this statement that Flohr was commenting on the pro-gun-rights viewpoint plaintiff and the others with her wished to communicate as participants in the walkout. Flohr then turned his back on plaintiff and her group and refused further discussion with them. This decision by Flohr not to take action to allow plaintiff and her group to present their viewpoint kept them from doing so.

Defendants also seek dismissal of the claims against Flohr and Dougherty based on qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right, and existing precedent must have placed the statutory or constitutional question beyond debate." Rabin v. Flynn, 725 F.3d 628, 632 (7th Cir. 2013) (quotation marks and citations omitted). The "clearly established law must be 'particularized' to the facts of the case." White v. Pauly, __ U..S. __, 137 S. Ct. 548, 552 (2017). "Qualified immunity is an affirmative defense, but plaintiff carries the

---

[3] The complaint makes no allegations concerning any actions by Superintendent Dugan.

burden of defeating it once raised. To defeat the qualified immunity defense, a plaintiff must show: (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." Ewell v. Toney, 853 F.3d 911, 919 (7th Cir. 2017) (citation omitted). When qualified immunity is raised in a Rule 12(b)(6) motion, the facts and all reasonable inferences from them are considered in the light most favorable to the nonmoving party. Id., at 918-19. The crucial question is whether the official acted reasonably in the particular circumstances faced by the official. Reed v. Palmer, 906 F.3d 540, 547 (7th Cir. 2018). "Because a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." Id., at 548.

Tinker clearly establishes that in a public school setting "[t]he prohibition of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible" Tinker, 393 U.S. at 511. The complaint alleges the administration and faculty of HCHS helped facilitate the walkout by providing an area on the school grounds for students to congregate and by not punishing students for leaving class in the middle of a class period. It alleges fifty to seventy-five students exited the building under the direction of school personnel and gathered on the football field when the time for the walkout arrived. Taking these allegations as true for purposes of the motion to dismiss, it is clear that a significant number of students leaving their classes in the middle of a class period, going outside the school building, congregating on the football field, and engaging in a demonstration advocating the government taking certain actions to address school safety was not viewed by the school's administration as a material or substantial interference with schoolwork or discipline. Plaintiff, and approximately five other students, who wished to participate in the event on the football field were prohibited from doing so by Dougherty. The basis for this denial was their wishing to present, by carrying signs, a viewpoint on the subject of school safety that differed from that being presented by those allowed to congregate on the football field. When addressing plaintiff as she sought the same access to the football field as the larger group received to convey her message, Flohr stated "you are the only ones who feel that way" and he declined to take action to allow plaintiff's small group to enter the area where the larger group was congregated.

Defendants argue the allegations plaintiff makes in her complaint, show Flohr and Dougherty could have believed their actions were lawful in light of clearly established law and the information they possessed at the time. They cite plaintiff's allegation that Dougherty told her she would disturb the peace and start a fight, that she and her group were troublemakers, and that he warned her not to bully students with different views as showing Dougherty was acting to keep plaintiff from materially and substantially interfering with the requirements of appropriate discipline in the operation of the school. However, these alleged statements of Dougherty can also plausibly be taken as an expression of his disdain for the viewpoint plaintiff wished to present – deeming any person who holds such a view as a troublemaker and disturber of the peace. Flohr's statement that "you are the only ones who feel that way" can also plausibly be taken as disapproval of plaintiff's view. For purposes of surviving a motion to dismiss, plaintiff

has plausibly alleged Flohr and Dougherty prohibited plaintiff from expressing her views based on the content of those views, while allowing other students to express a contrary view, without evidence that prohibiting plaintiff's expression of her views was necessary to avoid material interference with schoolwork or discipline.  Plaintiff may or may not be able to prove these allegations but she has alleged enough to survive defendants' motion to dismiss the individual capacity claims against Flohr and Dougherty.

      For the foregoing reasons, defendants' motion to dismiss [14] is granted in part and denied in part.  The motion is granted as to the claims against the District and against Dugan, Flohr, and Dougherty in their official capacities and denied as to the individual capacity claims against Flohr and Dougherty.  There is a presumption in favor of giving plaintiff at least one opportunity to amend a complaint that is dismissed.  <u>Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago</u>, 786 F.3d 510, 518 (7th Cir. 2015), and the court will afford plaintiff such an opportunity if plaintiff wishes to file one and can do so consistent with Fed. R. Civ. P. 11.  The claims against the District are dismissed without prejudice.  The official capacity claims are redundant and should not be included in any amended complaint.  The parties are directed to contact the magistrate judge on or before June 7, 2019 to discuss settlement possibilities.  If no settlement is reached, the magistrate judge will set a deadline for filing any amended complaint against the District.

Date: 5/15/2019                        ENTER:

                                                _____
                                            United States District Court Judge

                                                              Electronic Notices. (LC)